**FILED**

**March 29, 2021**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

United States District
Court of Fort Worth

Shawna N. Enloe #03306-479
      V
Warden Carr
Lt. Anthony
Lt Butler
Ms. Cole-Rowls
Dr Langham
Ms. Lux

4:21cv466-O

Motion Under 42 U.S.C
§1983 and Bivens Claims

Comes Now, Shawna N. Enloe      , know herein as
the Plaintiff in ProSe, nescessary seeking relief Under
Violation trusted upon her by the Defendants Her
Eighth Amendment along with her. Fourteeth
Amendment rights have been maliciously, humiliatingly
and Deliberately violated and contiue to violate by the
Defendants.
    The Eigth Amendment, which forbids "cruel and
unusual punishments" governs the treatment of
convicted prisoners. The Plaintiff will SHOW an objectiv
ive componers and the subjective components to SHOW
the evidence of the seriouness and state of minds
that the Defendant possessed and still till this

date possess

Oh April the 4th of 2020 housing unit 2 North at FMC Carswell was placed on a total lockdown

About Eight minutes after being screamed at and herded into our cells, while being called "Bitches," "Retards" and more, it was told to 2 North housing unit that we were quarentined due to several inmates in our housing unit running high fevers. Testing was not done to comfirm them to be COVID-19 positive though and they were left inside the Plaintiff's 2 North housing unit with 290 other ladies that live together

The Plaintiff fear of death was and is very profound. Ms. Lux came into 2 North and stood halfway up a stairway and notified the unit that "The media is lying and their information is fake about COVID-19 and the young pregnant lady who lost her life to COVID-19".

The total disregard for this young mother and unborn child was heartbreaking and caused 2 North the Plaintiff included to emotionaly breakdown and realize that COVID-19 made it into FMC Carswell and the Warden and higher ranking staff members were actively keeping it "hush hush". If the media had not reported on the tramic death then the true facts of danger would have continued to be hidden from the Plaintiff.

On April the 9th of 2020 a unnamed officer speaking to several inmates stated;"Two of FMC

Carswells own officers had passed away from COVID-19"

When asked, "How come everyone is not being tested including the staff, since the staff members leave and come in and out of differant areas not wearing any protective gear or mask?"

The answer was simple, "Because you're just inmates"

The feeling that over took this Plaintiff and many was best discribed like a small kitten or puppy, beat on, spit on, and pushed into a dorner.

While the threat of a raging fire moves towards them and death and fear are all that is left for them to feel.

On April the 9th we are told our qurentine is lifted at 10:00 am, Only for two and half hours later we were put back onto qurentine because Officer Hernandez was tested for COVID-19 here at FMC Carswell because he was working inside the 2 North housing unit with positive inmates.

A unnamed officer (at this time) told the Plaintiff and others including but not limited to: Faith Blake; Tiffany Snodgrass that the warden had made the "request" that "if" an employee was going to get a COVID-19 test to get tested off site so he could continue to work them."

The knowledge that a killer virus had entered the prison was unjustifiably allowed the deathes and unknown longterm effects to over run the ladies at FMC Carswell The significant measures



that the CDC had made the world aware of such as; washing your hands often, social distancing "6ft" apart, wearing of mask and gloves along with the use of hand sanitizers was Deliberate, Indifference that our Constitution states can not be tolerated.

The Plaintiff can not self protect any way because the simplest of the CDC guidelines "washing of our hands" seems that it would and should be the easiest of steps to a person (any person) could do to self protect against COVID-19. Inside the Plaintiff 2 North unit that is not the case. Soap is not provided in the restrooms, to wash our hands regurlary. The staff at FMC Carswell etc., the Warden, Ms Cole-Rowls and counslor Gardner refuse to provide the much needed soap. It has been 16 days without now and when is finaly given the staff orders it to be watered down by at least 50% or the unit ordelys will get a shot for not fallowing direct orders.

When Cole-Rowls and Gardner, stated loudly to the whole unit "I don't give a shit about you all getting soap!!"

When inmates respond, "We are writing you both up!" They laugh

The Warden and staff were sent countless written copouts and emails copouts begging for soap. No one would respond to our cries

With out this killer pandemic, having soap should never be anything a human has to beg for
Conditions at FMC Carswell have amounted



to the unnecessary and wanton infliction of pain; the following:

Statements of FACTUAL EVENTS

1) On July 1ST, 2020 the 3rd of the lockdown after thies confirmed cases from the Plaintiff's 2 North unit at 6:04pm Lt. Anthony along with Mr. Bulter charge in to the unit. Lt. Anthony was waving a large shot gun in the air, screaming at all inmates, as was Bulter. There was No fighting by inmates to cause said action, there was simply a line peacefully awaiting to use the ladies room. Per policy they do not pull guns against inmates unless the unit has been lost controll over or more than six inmates are fighting.
Nothing even provable by camara was happening

2) Anthony stated, "Meet the real Me!"

3) "You pick inmates, Pee and I shoot You!"

4) "I will shoot one of you before this is over"

5) "Try me, God Please!"

6) "I want someone to step forward and tell me to stop. I dare you.... Come on who has balls... no body... nothing but pussys!"

7) "You will never get another hot meal I'll see to it"

8) "I'll run this bitch no one else!"

9) "My word is God's!"

10) "Take those two rooms to the SHU right NOW... awww yeah I love it... some one else want to tell me to STOP?"

11) "You will service on Bag nastys period!"



12) "We go home and eat ha!ha!ha! we eat we take care of our health and our families!"

13) "You want to stand in lines to pee, we will make your life a living hell TRY ME!"

14) (To the cell next to 124) "I will shoot you in your fucking face ~ send her to the SHU!" (That was said to a woman sitting on her top bunk who said, "I only wanted to change my tampon Sir."

15) "I'm coming for all!"

Mr. Butler: July 1st 2020

10:05pm   1) "You ARE BREATHING THAT'S WRONG ENOGH!"

2) "Damn Cows

3) "And then I'm coming in here and I will take your fucking mattresses and bedding, sleep on cold metal. It's enough that you all suck up my air."

4) "Fucking useless inmates your kind are no matter, no one will miss you and the fucking COVID-19 can kill you slowly and the whole time I get to watch the suffering, all is a good day on the job for us."

All our lives are mentaly and health wise under full blown threats and true. FACTUAL Abuse and torment. COVID-19 is a True Threat to all the world and as a inmates inside a cooking pot of infection now the Plaintiff must fearfully hide under a bed or under blankets to try to ensure body safely from the men in charge. at her prison who made it clear their desire to watch and aide in the suffering

of every single inmate

The Plaintiff spent long tear filled hours curled up into herself from verbal attacks and the hunger and fear that she would never have believed such treatment occures inside our American prison system. Inmates are not all bad people who wish hate or harm upon anyone. most are not even violent. but the treatment they are subject to is past what our constitution claims we the people will put up with

The CDC had to update the threats that COVID-19 now TRUELY attacks with highier risks associated with obesity start at much lower body mass index. The CDC had held that only the morbidly obese (BMI-42+) were at. Now, the CDC says anyone with a BMI of 30+ is at risk. Under the old standard a 50-year old 6ft tall man would have to weigh 310 lbs to be at risk. Now, the same guy only has to tip the scales at 225 lbs to exceed a BMI of 30.

Other conditions CDC identifed as elevating COVID-19 risk included chronic kidney disease, COPD, weaker immune systems due to organ transplant, heart conditions, sickle cell, type 1 and 2 diabetes, asthma, dementia, cerebrovas-cular diseases, cystic fibrosis, pregnacy and an inherited blood disorder known as thalasemia

Wilson V. Seiter, 501 U.S at 297

In respect to living conditions, prisoners must demonstrate "unquestions and serious deprivation of basic human needs" or of the

"minimal civilized measure of life's necessities" when establish an Eigth Amendment violation.

See Roodes V Chapman, 452 U.S. at 347; accord Wilson V. Seiter, 501 U.S at 308. In Wilson V. Seiter, 501 U.S at 304. "Shelter" includes various aspects of physical conditions including lighting, ventilation and structural deterioration.

Unit 2 North's toilets are out of working order and one has had a trashbag over it and leaks water, leaving standing water, this has been the case for over a year and half. The stall doors are held closed with yarn, While the mold filled showers are held closed by using tampon applicators! If the shower door opens as we shower, we are threatened with a PREA shot, that fdo ows that inmate their whole sentence and lists them as a "sex offender." This then remove your email rights, which is how they contact their families. Not to mention the threats of beatings and more when another inmate finds out they are a "sex offender"

Lt. Anthony was screaming "You want Shot?" "Get your fucking asses to your cells!" "Who wants some?" (While pointing, waving and standing in a highly aggressive threating way)

When women were rushing to their cells some shaking and cring out of shock and fear other ladies were trying to explain "We were only trying to go to the restroom Sir"



Anthony screamed, "Try me Please... go to the restroom I am going to finally get to shoot one of your asses And trust me I have been waiting." Lt. Butler was laughing and saying, "shit it's bad enough that you are breathing."

Lt. Anthony charged into cell 125-126 (off the view of the cameras) got into the girls faces and was pounding his chest screaming, "Which one of you wants to get shot because one of you are"

The Plaintiff could not hold back the body tremors and tears that rushed down her face. The emotional pain and fear had the Plaintiff afraid someone, even possibly her, was going to die

See Parrish V. Johnson, 800 F. 2d 600, 604 (6th cir. 1986) (holding that an officer's waving of a knife in a paraplegy prisoner's face knife-point, extortion of potato chips and cookies, incessant taunting, and failure to relay requests for medical care to the nurses violated the Eighth Amendment

Looking to Helling V. McKinney 509 US 25, 33, 113 US. Ct 2475 (1993) ("a remedy for unsafe conditions need not await a tragic event"). Helling concerned exposure to tobacco smoke; other examples cited by the court included exposure to the risk of infectious disease; unsafe drinking water exposed wiring deficient firefighting measures, and assault. Id, 509 US. at 33-34; see also Hill V. Marshall, 962 F, 2d 1209, 1213-14 (6th cir, 1992) (risk of developing tuberculosis); Powell V Lennon, 914 F, 2d 1459, 1463 (11th cir. 1990) (exposure to asbestos);

Johnson-El V. Schoemeh, 878 F. 2d 1043, 1045-55 (8th cir. 1989)(pesticides); Clark V. Morgan, 710 F. 2d, 4, 9-11 (1st cir 1983)(cancer-causing chemical).

COVID-19 is like nothing our nation has ever seen before The tragic deaths, the earth shaking fear the unknown future risks it may have. Now the Plaintiff suffers not only the much highier risks of COVID-19 becuase she is housed inside a "tinder box" but the Plaintiff is forced to live "severe discomfort" This is total Deliberated Indifference by these BOP staff members. Being held in especially degrading or abusive conditions. Even if the Plaintiff were exposed for short periods of time to this cruel and unusual treatment it would be held unconstitutional

See, e.g. Hope V. Pelzer, 536 U.S. 730, 738, 122 S.Ct. 2508 (2002)(holding "hitching post" restraints for seven hours violated Eighth Amendment. ; Surprenant V. Rivas, 424 F,3d 5, 19-20 (1st cir, 2005) (holding three weeks in segregation under unsanitary conditions would violate detainees due process rights. Which were held equal to Eighth Amendment protections); Despain V. Upboff, 264 F 3d 965, 974 (10 cir. 2001)(holding 36 hours subjection to unsanitary flooding and exposure to human waste stated a claim "exposure to human waste carries particular weight)" Gaston V Couglin. 249 F. 3d 156, 166 (2d cir, 2001) (plaintiff's allegation that for several days the area in front of his cell was filled with feces urine and sewage water stated an Eight Amendment claim)" McBride V Deer 240 F. 3d 1287 1291-92 (10th cir. 2001) (three days in feces-covered cell without cleaning materials stated a

constitutional claim); Johnson V. Lewis 217 F.3d 726,735 (9th cir 2000) (holding that evidence that prisoner's were held in the yard for 4 days in the summer and 17 hours in the winter, without toilet access, without drinking water for several hours without warm clothing during subfreezing weather supported an Eighth Amendment claim).

If the court allows the Plaintiff to skip ahead a little but will return to the time period that was being discussed shortly the FACTS are supported by these case also and the Plaintiff does not wish to repeat herself, wasting the courts and hers time.

In Feb 2021, Texas experienced the harshest winter in a hundred years. It did not simply surprize Texas over night... the news covered the coming severe storm for over a week. Making sure Texas citizens could plan and prepare to keep themselves and love ones safe. A FMC Carswell the Warden nor Staff made any precaustionary mesures to ensure the Plaintiff's along with the other 1,100 female inmates safe. A basic human need was HEAT, The temps dropped under -2°

Snow and ice covered the roads causing a hundred car pile up The heating system did not work before this freezing storm. That was a known Fact by this Warden and his staff. The failure to ensure the woman's safety is Deliberate Indifference to their need.

The women lived in zero warmth. Unable to self protect from these brutal conditions Plainly

this is a disproportionate extreme conduct forced on to the Plaintiff and other ladies. The serious psychological plain, misery, fear and the purposefully dehumanizing actions by this FMC Defendants and the total disregard to the living conditions must be considered a Eighth Amendment Violation, our Constitution demands that.

See Scher V. Engelke, 943 F.2d 921, 924 (8th cir. 1981) ("The Scope of eighth Amendment protection is broader than the mere infliction of physical pain"; evidence of fear, mental anguish and misery "can establish the requisite injury for an Eighth Amendment claim]; Kingsley V. Bureau of Prison, 937 F.2d 26, 32, (2nd cir 1991); White V. Napoleon, 897 F.2d 103, 111 (3rd cir. 1986) Davenport V. DeRobertis, 653 F.Supp. 649, 656-58, 663-64 (N.D. Ill. 1987) aff'd in pertinent part 844 F.2d 1310 (7th cir 1988); Mitchell V. Newryder, 245 F.Supp. 2d 200, 204 (D. Me. 2003) (holding prisoner denied access to toilet stated avail'd claim that he was "purposefully subjected to de-humanizing prison conditions" regardless of any risk of harm); Coleman V. Vasquez, 142 F.Supp. 2d 226, 236 (D. Conn., 2001) (cumulative emotional pain to a female sexual assault victim from pat frisking by male staff may be sufficient injury to support an Eighth Amendment claim); see also Hope V. Pelzer, 536 U.S. 730, 738, 745 122 S.ct. 2508 (2002) (citing "risk of particular discomfort and humiliation from lack of bath-room breaks in addition to pain and risk of

injury, from "hitching post" restraints stating prisoner was treated in a way "antithetical to human dignity"). See Startelegram.com for news reports by: Kailey Johnson Feb. 19th and before on FMC Carswell.

The Plaintiff was without heat for six days during the worst storm in a hundred years. Until Faith Blake and Shelly Mixson called Kailey Johnson and reported no water for two days (FMC Carswell did not bother to provide any drinking water during this two days). No toilets could be flushed and 290 ladies are housed with Plaintiff in 2 North housing unit so the feces and urine ran over on to the floors and the smells the Plaintiff was subjected to are still lodged deep into her nose and brain. The Plaintiff was forced to walk in the below temps to get her sack dinner and lunch to then return to freezing temps in the unit.

FMC gave "two" bottles of water on Saturday Feb. 19th 2021 After Kaileys news report ran, not because it was right thing to do, but simply as a way to claim "bottled water" was given out. With Texas saying "boil your water." How can the Plaintiff? How can the Plaintiff self-care of self-protect with two bottles of water a day.

The heat came on Magically the day after the news report was ran.

Now, back to claims that we were covering before. We MUST ask ourselves these questions.

A) Would we feel okay and tolerate ourselves ( or any of our friends or loved ones to be forceably

moved into a known confirmed Positive room of people and say that is the standard in which we condone?

- If the answer is yes, then dismiss these claims and take your mask off and DO NOT practice any of the CDC guidelines.
- If the answer is No, then you need go no further and MUST Grant this §1983 claim.

FMC Carswell Factualy moved negitive inmates and positive inmates from housing unit after housing unit. From straight off the bus into housing unit 2 North into cells with "recovered" people (no 14day quarentine) As of Jan 10th 2021 an ongoing right now as of Feburary 19th 2021. Inmates who never tested positive for the COVID-19 virus were forceably moved into housing unit 1 South and the FMC Carswell moved known positive COVID-19 inmates into 1 South. The Warden then said he was "sorry" for the mixing up, but noone would return to their housing unit until they each tested POSITIVE!

Noone can know the effects COVID-19 will have on a person and to FORCE women to catch COVID-19 is in no question "cruel and unusual".

COVID-19 is a killer and every human being deserves the right to protect their health and life.

Forcing a person to get a unknown killing virus is a possible sentence to death. How would a person recover from the infliction? How would their family?

FMC Carswell may be listed as the "medical facility" and the fact that they are in no way lifts the burden or

excues the violations to the Plaintffs Eighth Amendment rights. If anything at all FMC Carswell should be held to a high standard of care and responsibility then other prisons, in saying that the Plaintiff can not find one justification for the clear and plain Deliberate Indifference so callously practiced at FMC Carswell.

In Eighth Amendment cases, courts inquire whether conditions, "alone or in combination,...deprive inmates of the minimal civilized measure of lifes necessities." Rhodes V. Chapman, 452 U.S. at 347 (emphasis supplied); accord Surprenant V. Rivas, 424 F.3d 5, 19-20 (1st Cir. 2005) (holding jury could find round-the-clock lock-in denial of hygienic products, limited access to water and multiple daily strip searches unconstitutional taken together, even if case law was "in some disarray" about those conditions individually).

Under this "totality of the circumstances" approach Rhodes V. Chapman, 452 U.S at 363 (Brennan J., concurring merely undecent conditions do not automatically become unconstitutional when you add them together. Rather conditions must have "a mutually enforcing effect that produces the deprivation of a single indentifiable human need" in order to become unconstitutional in combination. Wilson V. Seiter, 501 U.S. 294 304 111 SCt. 2321 (1991); see Mitchell V Maynard, 80 F3d 1434 1442 (10th cir. 1996) (holding placement in a concrete cell with no heat, deprivation of clothing, mattress blankets or any other bedding, prescription eyeglasses out-of cell exercise, utensils, adequate ventilation or hot water



and allowance only of minimal amounts of toilet paper, in combination, were a "significant departure from the healthy habilitative enviroment the state is required to provide its inmates")(citation omitted);

Ruiz V Johnson 37 F. Supp. 2d 855, 929 (S.D. Tex 1999) ("the combination of inmates who are routinely subject to violence, extortion, and rope, of officers who are aware of inmate-on-inmate victimization but fail to respond to the victims, of high barriers preventing inmates from seeking safekeeping or protective custody, and of a system that fails accurately to report, among other data, instances of requests for safe keeping and sexual assaults, and as well, the deviousness of the risk to prison conditions cruel and unusual by denying inmates safety from their fellow inmates"); Carty V. Farrelly 957 F.Supp 727 735-36 (D.V.I.1997) (finding shelter provided by jail constitutionally inadequate based on consideration of multiple factors).


The Plaintiff finds that failure to provide safety from fellow inmates and very interesting statement of case law. Seeing that FMC Carswell not only refused to safe keep the Plaintiff and other inmates along with its own prison staff while the overwhelmingly obvious risk of COVID-19 was storming through the world and at a five times highier rate inside the prisons that cruely and purposely mixing positive and negatives, refusing 2 North hand soap for 16 days and again for 11 days, No proper mask, No sanitizer given nor offered on commissary, No gloves, No

social distancing, No cleaners, rotten food, and No hot meals for over 20 days, with the added mental pysical, emotional abuse by these Defendants has to meet the standards of failure by FMC Carswell and each defendant name here in.

While Lt. Anthony and Lt. Butler threatened, brandished large firearms and more, the Plaintff watched helplessly while ladies stood in their door ways with blood running down their legs, because the tampons could not hold back the blood as long as we were forced to go without the restroom, all these ladies and the Plaintiff were doing was waiting in a line to get to the restroom.

A women could not suffer any more of a degrading or abusive conditions that are unconstitutional even if imposed for short periods of time.

All other housing units of FMC Carswell were provided soap, toilted paper, cleaning supplies and only one other unit suffer Lt. Anthoney and Butler's abuse. The Warden was made known of the abuses and in person when the Warden was asked, "Why does Lt. Anthony not have to wear a mask inside the prison and while standing next to you and myself?"

Lt Anthoney leaned in almost nose to nose with inmate Tiffany Snodgrass and said "Because I don't have too!"

The Warden the looked at Snodgrass and stated with a smile on his face, "Does that answer your question?" Snodgrass replied, "No it does not, but



do I have a choice?"

And the Warden said, "Good, glad you're clear now." FMC Carswell had 14,000 medical grade mask for all inmates and a single inmate was orderd to pack all of them up by her boss, by orders of the Warden and Warden knowingly get rid of the proper mask to replace them with hand made by UNICOR. Masks made with the same fabric used to make the mens boxers. That inmate is Bishop, also sueing.

Deliberate indifference in Eighth Amendment cases falls somewhere between mere negligence (carelessness) and actual malice (intent to cause harm) Farmer v. Brennan, 511 U.S at 835-36; Wilson V. Seiter, 501 US at 297-304

Gross negligence is a "nebulous" term that generally means" something similar to the civial law recklessness standard. Farmer, 511 US. at 836 n.4; see also Canton V. Harris, 489 U.S. 378, 388 n.7 109 S Ct. 1197 (1989) (suggesting that gross negligence is not the same as deliberate indifference.

And the Plaintiff does not wish the court to think that she would ever agree that these defendants were merely negligent. The Supreme Court has held that a prison official can be found reckless or deliberately indifferent if "the official knows of and disregards Farmer, 511 U.S. at 837.

Warden Carr and Staff members named as defendants and unnamed Staff members can never claim that COVID-19 just snuck up on them overnight and they had less then a few hours to prepare for this

killer virus and storm of historical measures.

The media covered almost nothing but COVID-19 news. The BOP released all of their statements of how much "Extraordinary" care they were taking to keep inmates safe. Warden Carr repeats those statement yet in the denials for every single inmate at Carswell, Warden Carr states, that there are no Extraordinay or Compelling reasons to grant the Compassionate. So, this Plaintiff ask the Court and the public -"If he is practicing and taking "Extraordinary" steps to protect and care for us... "Why if there are no Extraordinary or Compelling reasons" for a compassionate person. A person can not have it both ways and both be true

The fact that a condition or a risk was obvious is circumstantial evedence that will permit a judge or jury to conclude that a defendant evidence about what the defendant knew. Farmer V. Brennan. 511 U.S at 842-43; id at 837 (the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the indifference"); See Hope V. Pelzer, 536 US 730 738, 122 S Ct 2508 (2002); Vinning-El V. Long, 482 F 3d 923, 924-25 (7th cir. 2007) (holding jury could infer that guards working in the area knew about grossly filthy cell conditions); Estate of Carter V. City of Detroit, 408 F3d 305, 312-13 (6th cir 2005) (holding a jury could infer actual knowledge of a risk from a defendants knowledge of a prisoner's condition, and could discount the defendant's claim he did not belive she was at risk); Lolli V. County

of Orange, 351 F.3d 410, 420-21 (9th cir. 2003) (holding off-icers indiffrence to a diabetic prisoner's extreme be-havior sickly appearance. and explict statement about his condition could support a finding of actual know-ledge of a serious risk); Wilson V. Seiter, 501 U.S. 294, 300, 111 S.ct. 2321 (1991) ("the long duration of a cruel prison condition may make it easier to establish knowledge") (emphasis in original).

For these defendant's to claim they had no know-ledge of the coming of the dangerous, possibly life threatening COVID-19 and then to go on to claim to knowledge of the history making winter storm would only be justified if each defendant was locked away in a dark room, in a coma. There's not a news channel or paper internet posting, last but not least the defendant's own heads at BOP and DOJ, made it clear what was coming and these defe-ndants simple could not be bothered.

The Plaintiff witnessed many ladies crying out for help for their fevers, pain, lungs and the medi-cal staff would state "You're fine its allergys" or We are not going to give you anything, get it off commissary" and would lie and place temps on the form that was wrong therefore no questions ever accorded.

Commissary was stripped from prisioner's not allowing the women to purchase fever relief, water food, soap, shampoo or any hygine.

Commissary shut down was because the FMC Carswell staff did not wish to work to bring it over to



any unit. The Warden agreed with them and allowed the Plaintiff and others to suffer the basic elements of hygine were striped from the Plaintiff by the defendant's not providing and then by the defendants blocking the buying to attempt to self-care and protect.

Tampons and pads were not provided and cole-Rowls and LUX said "40 use socks, because they did not care."

Before the honorable Court asks..."Yes the Warden was emailed by many in 2North and no replys have ever been given. Then the Warden removed his link for us to be able to email him personaly.

(B). Shelter

A prisoner must be provided with "Shelter which does not cause his degeneration or threaten his mental and physical well being. Ramos V. Lemm 639 F 2d 559, 568 (10th cir. 1980).

(1) Crowding

One important aspect of shelter is whether it is adequate to the number of people confined in it.

The Plaintiff is in a two person cell that is that has-four inmates in it. She can sit on her cellmates hands. The six feet social distancing to help a person protect their lives can not be practiced.

This Pandemic has brought to light the deplorable deliberate Indifference and the complete

break down in medical care, Food service, deteriorated phy-sical conditions, complete lack of mental care and not only a lack of mental care but the humor and insulting attempts. at them claiming they came through 2North's unit. Harris V. Angelina County, Texas 952 F.2d 820, 824-25 (4th Cir. 1992) ("over-crowding accompained by unsanitary and dangerous conditions can constitute an Eighth Amendment violation"); Wellman V. Faulkner, 715 F2d 269, 274 (7th Cir, 1983) (pro-blems with physical plant sanitation, food services, and recreation!)

It has been over a year that this pandemic has been chaging our world and the way in which we care for ourselves and others

These conditions have been ongoing before this new threat, but no inmate was ever brave enough to stand up and let the courts and World Know what's truely going on inside FMC Carswell, until the Plaintiff and others had to be in fear of death and watched fellow inmates beg for help and recieve none, only to die.

Lt Butler screamed "I will come in this Fucking unit and take your blankets and mattersses and laugh while you sleep on just the cold metal bunks.

While I am here I am taking every bit of commis-sary you may have so that you can complain some more about eating "bag nasties"! let's see how long you last then"...

The Plaintiff understood Lt. Butler's threats were very true so did the other Staff standing with him While he threatened each of us. Lt. Butler



is the Lt. over the SHU and it is his practice to strip ladies of their mats and blankets and to issue no more then 3 pads a week if they are bleeding. The temps are kept so cold there that your body hurts and you just need warmth. This is condoned by the Warden and the defendants listed in this lawsuit, as they each walk through the SHU housing unit and do nothing to help, instead they laugh or say, "Don't come to the SHU if you don't like it here."

Lt. Anthony and counselor Gardner, nurse and more were all standing with Lt. Butler while he screamed his threat. Noone came to our aide. Thompson V. City of Los Angeles, 885 F.2d 1439, 1448 (9th cir 1989); Anela V. Wildwood, 790 F.2d 1063, 1069 (3rd cir 1986)(holding overnight detention without beds or mattress, appeared to deny due process); Oladipupo V. Austin 104 F. Supp 2d 626, 639 (W.D. La. 2000) ("a mattress is a basic human need, Which MUST be provided to a detainee"). But see Stone-El V. Sheahan, 914 F. Supp. 202, 206 (N.D. Ill 1995).

(2) Ventilation and Heating

Ventilation is a fundamental attribute of "shelter" and sanitation; both of which are basic Eighth Amendment concerns. Minifield V. Butikofer, 298. F. Supp. 2d 900, 904 (N.D. Cal. 2004). Many courts have held that inadequate ventilation violates the Eighth Amendment of contributes to an unconstitutional combination of conditions. Benjamin V. Fraser, 343 F.3d 35, 52 (2nd cir. 2003)(evidence of large numbers of inoperable windows, clogged or dirty ven-

tilation registers and exhaust vents in showers and cells, and poor air quality", plus finding concerning threatened and actual health hazards, supported finding of constitutionally inadequate ventilation); Board V. Farmhalm, 394 F 3d 469, 486 (7th cir. 2005)(holding evidence that ventilation system was contaminated with fiber glass dust and mold supported on Eighth Amendment claim); Keenan V. Hall, 83 F. 3d 1083, 1090(9th cir 1996)(holding allegations that the air was saturated with the fumes of feces, urine, and vomit supported an Eighth Amendment ventilation claim), amended on other grounds, 135 F3d 1318 (9th cir. 1998).

In a North housing unit where the Plaintiff lives the ventilation is so packed with hair, dust and insect dropings that the mixture hangs from some of the vents. The CDC acknowledged that COVID-19 virus could travel through the venting system and even that it was so tiny that filters could not stop it so a new filter was made to stop COVID-19's travel through vents.

Hospitals (that are REAL unlike FMC Medical) have the rooms that the infected stay in sealed by clear plastic, that covers every inch to block the virus or at least slow the spread. The Warden came into the units and had cheap plastic shower curtains tanned up in the cell doorways, after almost the whole unit was sick(but the remaining negitives were forced to stay there still and in cells with tested positive inmates.) This measure was a sad show of the care this Warden and defendants felt for the inmates. These shower curtains did not seal the door ways. Did not go all the way to the floor, they were 2ft

above the floor. The sides flaped and middle was soild, unlike the medical curtains that have a slit down the center that seals up. Ms. Cole-Rowls along with Warden Carr and Lt. Anthony came into 2North and said, "Well at least maybe these will slow it down some and we understand its too late."

They proceeded to move through the unit and take photographs of the Warden "ajusting" shower curtains. None of those photos showed the trueness of the height of 2ft off the ground nor that they were merely cheap shower curtains.

When the winter storm hit Texas and temps were -2° and lower 2 North had <u>No Heat</u> for six days. Freezing and suffering with <u>No Water</u> for two days and <u>No Hot Water</u> for another two was beyond extreme conditions added with the COVID-19.

Inadequate or excessive heat also violates that 2321 (1991) (warmth is a basic human need; low temperatures and no blankets would violate the Eighth Amendment); <u>Benjamin V. Fraser</u>, 343 F. 3d at 52 (affirming finding of unconstitutionality based on evidence of extreme temperatures, including no heat at times during winter); <u>Dixon V. Godinez</u> 114 F. 3d 640, 642-45 (7th cir. 1997) (..."[P]risoners' have a right to protection from extreme cold"; cold alone may violate the Eighth Amendment;

"Severe discomfort" can be unconstitutional without imminently threatening health.

On top of watering down the soap so the clean-

ing power is less. They will leave 2North without any soap for 10 to 12 days with ease. No commissary and what do the courts and public and CDC say a women should do? Signs were rushed to be taped up the morning Regional was walking through that addressed how and the importance of hand washing often, also signs for sleeping head to foot. Which they removed swiftly after walk through or photographs were taken to show they posted the proper information

Prisons are required to provide for clean clothing, and bedding, and to make available to-ilet articles such as soap, toothbrush and toothpaste, sanitary napkins, and toilet paper. Board V. Farnham, 394 F. 3d. 469, 481-82 (7th cir 2005) ("the right to toothpaste as an essential hygine product is analogus to the established right to a nutritionally adequate diet"); Myers V. Hundley, 101 F.3d 542, 544 (8th cir. 1996) ("a long-term repleated deprivation of adequate rights... Prisons may either regulary provide these supplies to inmates free of charge or they may give inmates a suffient allowance with which to buy them."); Penrod V. Zavaras, 94 F.3d.1399, 1406 (10th cir. 1996) (allegation of denial of free toothpaste and razors to indigent prisoner raised a factual issue under the Eighth Amendment. Where plaintiff alleged serious harm as a result);

July 7th 2020 supplies were finaly issued after 7 weeks or more without!!!

In Qurantine the ladies got only the fallowing
(1) 1 Roll of toilet paper a week per inmate



(2) 1 Bar of soap per inmate

(3) 5 pads or 5 tampons per inmate (can not have both)

C. Sanitation and Personal Hygiene

"A sanitary enviroment is a basic human need that a penal institutional must provide for all inmates". Carver V. Knox County, Tenn., 753 F. Supp. 1370, 1389 (E.D. Tenn. 1989) ("functioning sinks, toilets and showers are basic necessities of modern life, particularly within the confines of a wholly self contained environment such as jail") remanded for reconsideration 753 F. Supp. 1398 (E.D. Tenn. 1990)

The Plaintiff shows that three out of the seven toilets down stairs in 2 North do not work and one has had a plastic trash bag covering it for over a year and a half. So when COVID-19 started and to present. Three sinks out of six do not function the side panel has fallen off. Standing water from the trash bag toilet causes smells and grim. Sinks leaking and causing standing pools of water that the Plaintiff has fallen from.

FMC Carswell states they provide each housing unit with proper cleaning products. This inside 2 North could not get any further from the truth.

Ladies were moved from 2 south. The 2 South inmates into 2 North and 53, 2 North ladies moved to 2 South. The 2 South inmates were and are in shock at the realness of the rumors within

officers and inmates that 2North only get 3 rolls of
toilet paper a week if you're on your period or sick,
as most are there will NOT be any more given, period.
No other unit practies this. Soap is watered down
(ordered by Gardner and Cole-Rowls and known by
Lts and Warden the Plaintiff and many others
have spoken to the Warden in regards to this.
The answer given, "Thats 2North team problem."
That comes from the heads off this ship, so
what hope does an inmate have to be treated
human? None!

Sanitation and Personal Hygiene covered by our
Constitution under the Eighth Amendment for good
reasons, becuase humans should not be tortured
and forced to suffer.

"A sanitary environment is a basic human need
that a penal institution must provide for all inmates.
Toussaint V. McCarthy, 597 F. Supp. 1388, 1411 (N.D.
Cal. 1984) off'd in part and revd in part on other
grounds, 801 F. 2d 1080 (9th cir 1986); accord
Towsend V. Fuchs, 522 F.3d 765 was actionable
under Eighth Amendment); VinningEl V. Long, 482
F 3d. 923, 924 (7th cir. 2007) (holding confinement
in filthy cell without bedding toilet paper or work-
ing plumbing denied "minimal civilized measure of
lifes necessities"); Gates V. Cook, 376 F.3d 323,
338 (5th cir. 2004); Carty V. Farrelly, 957 F. Supp
727, 736 (D.V. I 1997) ("Generally sanitation is one
of the most basic humans needs.")

Could the public and Courts agree that ladies



being thrown into cells with known COVID-19 possitive cases, being made to eat rotten food to not being given pads or tampons to be refused any cleaning supplies for the cell or their own bodies be the basic way to treat someone?

The Eighth Amendment requires adequate arrangements for cleaning and garbage disposal Gates V. Cook 376 F3d. at 338 (affirming injunction to clean cells between occupants and make cleaning supplies avaiable Weekly); Hoptowit V. Spellman, 753 F2d 779, 784 (9th cir. 1985) (failure to provide adequate cleaning supplies); Ramos V. Lamm, 639 F2d. 559-70 (10th cir. 1980)(citing "lack of ~~routing~~ routine maintenance and cleaning programs" and inadequate cleaning supplies for inmates to clean their own cells in finding constitutional violation); Marion County Jail Inmates V. Anderson, 270 F. Supp 2d 1034, 1039, 1041 (S.D. Ind. 2003)(citing "unhealthy, unsanitary, dangerous, offensive conditions."

How much highier has the need for these protection to be taken seriously would it seem during a "Pandemic" Vs. Everyday Life?

The women in the lawsuit are only the names the public and courts will hear about. That does NOT mean we are the only ladies to suffer at these defendants hands with the support of their Bosses "The BOP." The Warden and staff members named inside this here lawsuit knew that the care and safety fully expect for the Courts and public to the Plaintiff's are

are dirty, trash, unworty of any rights.

It cannot be allowed to go on anylonger. The FMC Carswell's named staff Warden Carr and The BOP are guilty of murder and attempted murder period!

At FMC Carswell the kitchen has vermin and large flying roaches. The staff state, "Well it's not a 5 star resturant its fuckin prison if you dont like it Dont come or Leave!"

Rats eating inside the coolers in the bread bags that all inmates bread is served. Rat poop, pee and spit are left behind and we are still forced to serve it! Faith Blake was the "Staff Dining Cook" and had entered inside a cooler to get a bag of cheese and flour torts and there looking at her through the plastic bag was a rat. Blake was told to leave it for the inmates cooks and get another for "Staff dining."

Infestation by vermin may also violating the Eighth Amendment; Gaston V. Coughlin, 249 F.3d 156, 166 (2nd cir. 2001) (holding allegations of rodent infestation supported on Eighth Amendment claim).

Inside Housing unit 2North the sinks are always broken, one of seven toilets has been covered by trash bags for over 1'12 years. One North Unit over flowed with all the nasties ones mind can picture. Women go without hot water for days at time and during the history making winter of 2021 the ladies had no heat for 6 days temps outside were deadly at -2°. We went with no water period for two days and no hot water for four.

The freeze was history breaking and the media



covered it's coming for nearly two weeks before Texas was overtaken by the ice and snow. FMC's Warden did not have any concern to fix the heat knowing it was out of order. Deliberatly and Melicious ly not provide the health and safty to the "Hospital" Federal prison. Did they think to provide extra blankets and water for drinking? The answers "NO" not until the Sixth day When Faith Blake called Star telegram's Kailey Johnson shaking from the freezing temps to tell Ms. Johnson what they were going through and Ms. Johnson running the story right there gave the ONLY cause that could make the FMC Carswell hand-out an extra blanket, two bottles of water (once a day) for two days. The public's eyes matter in the world of private torture. The efforts were to late but proved that even Warden Carr and Staff know that what they push the women through at FMC Carswell is wrong, humiliating and antihetical to human dignity. The BOP makes the st claims in all of their press releases policies statements that they practice Extraordinary Measures to ensure the health and safety of the inmates under their care.

Then how have so many, 1983 Bevins Constitutional violation lawsuits been won by inmates?

The BOP is a large government business with large government Bullies, but once in a while a few are suffering.

The women are the most beat down class of inmates because most of them are already victims of abuse and very easy to abuse further

by the Biggest Bullies of all.

Who do the women reach out to inorder to be sa-ved protected remembered? Our public and our county courts! Out of fear from being told "No one cares anymore" "Ok, inmate try and I'll make your life inside Prison even harder" "We are the law!" So many do no speak out. The World's in a Pandemic thats a killer of anyone it chooses and just laying down and suffering dying, watching other BEG for help has to STOP NOW!

## Conclusion

The brave group of fellow ladies that came before Honorable Judge Mark Pittman seeking a class action lawsuit were ruled that Faith Blake could not represent the other 72 inmates and Ms. Blake understood. Honorable Judge Pittman gave each lady her own case number and added the lawsuit Ms. Blake had written on to each of theirs. In all honesty and after tons of threats by FMC Carswell's staff many backed away out of fear.

I was being moved all around to ensure I would become COVID-19 positive that I could not get to anyone to help a new I come before your Honorable Court with a lawsuit against The BOP FMC Carswell Warden Carr, Lt Anthony, Lt Butler, Ms Lux, Ms. Cole-Rolws. No person should ever be forced to live in such abuse and malice I can't breathe.

The mental suffering will along with the COVID-19 side effects stay with me forever and The BOP Warden Carr made sure that it would happen to us. Remembering his statement, "You are not coming out of this positive unit until you test positive period. It helps us get it all over with handling it this way."

Why not just End that with a "Good Luck" because no one can foresee how their body will handle the COVID-19. Mentally I am crushed My Country is not a country that does such acts... Right?

Done This 19 Day of March

Shawna Nicole Enloe
03306-479

State of Texas

Declaration of Verification
of
Shawna Nicole
Enloe
#03306-479

County of Tarrant

Declaration of Verification
Being first duly sworn, deposes as
follows:
My name is Shawna Nicole Enloe,
#03306-479. I am currently
incarcerated at FMC Carswell in
Ft. Worth, Texas. I have been
housed in 2North here since my
arrival in 2017 and this is my
testimony of our treatment during
the Covid-19 pandemic.
We went on lockdown April 1,
2020. We were given dirty and
ill-fitted, non-CDC approved, nor
medical standard masks. We are
still, to this day March 20, 2021
wearing the same masks. We are
not allowed to wear any other
masks unless we are working in
the hospital, only during the hours

we work and then told to throw away the CDC masks and put the cloth mask back or, otherwise we are given an incident report and punished. I have witnessed staff yelling at inmates who are working in food service for wearing the medical masks that are required of them when handling our food, then their boss having to tell that staff member, "calm down! These are MY workers! They're required to wear these mask!" I also seen at the time, no gloves or sanatizer was being provided.

Last April my attorney filed a 3582, Motion for compassionate release for me and I was denied because my judge said I was too young to even get the virus. Which later I did test positive. At the time there were only 2 positive cases which quickly turned into nearly 600. We were and still are scared, alone and victimized women, at the mercy

of warden Carr and the FBOP.

Back in June, 2020, we went on a National lockdown due to the riots and we were forced to eat "bag nasties!" with rotting meats and vegeatables. I literally was given a whole rotten, mildewed onion one day! During this time we had no soap in our restrooms for 13 days straight, no hot water for several days. We still to this day go without soap when we do have soap the unit Team and counselor Mrs. Gardner orders the ordely to water down our soap and cleaning solutions, I have watched the ordelies take the big jugs of solution and fill them up with 95-98% water!

In July of 2020, they began testing women who worked in sanitation in the hospital, Knowing these women were ordered to go from unit to unit to unit.... to work. They tested them only at the time! The prison claimed to "not have the funds to test everyone".

On July 2, 2020, I noticed that when we were able to still go over to the hospital, to get our food, which was served cold, that the doors and the handles, the commmon computers used for printing, etc were not being cleaned nor sanitized. They weren't cleaning the doors near 3 south where the diabetics come and go after pricking their fingers. The still never clean those doors. We all come and go through those doors.

There has NEVER been any form of social distancing. EVER! We live on top of each other in here. 4 women live in a cell that is probably 8ft x 5ft. The policy is suppose to be 2 women per cell. Region and Warden Carr know this and make no attempt to correct their illegal mishandling of our Housing per their policy. We have to rel'o against one another to move.

On July 3, 2020, we were told we had 23 positive cases, which was a lie! Theye're were many more reported. July 4, we weren't allowed to shower and told the water was off, clearly that was a lie because the sinks and toilets still worked. They simply didn't know how to handle the outbreak and kept us in our rooms. We weren't getting any commissary nor given free hygeines. The food was still rotten, muffins were covered in mold. I'm currently rereading my journal as I am writing and I see that inmate Mrs. Buck, Faith Blake's bunky, who slept 3 ft. from her, was told "we aren't going to tell you your test results right now because you have a big mouth!" Mrs. Blake was the only reason Mrs. Buck even got tested after 6 days of coughing, fevers, and struggling to catch her breath. Blake demanded she get help. Mrs. Buck has severe health

and medical, issues. Later that night we were told there were 30 cases, still no one was moved. The website stated 270 plus cases.

On Monday July 6, 2020, my bunky Ms. Bowker tested positive after showing symptoms. Myself and 2 other bunkies did NOT get tested! Not until the 8th were we tested. During this time on 104.5 (radio station) was talking about this prison and how we had a "MAJOR BREAKOUT!" We were told the news ~~wente~~ was "fake"! and we should only listen to them (the staff) because "they were here for us."

Also, the mattresses that the positive inmates slept on were suppose to be removed from the unit. They weren't! They never even got cleaned. When I got a chance and asked Lieutenat Rodriguez, about the mattresses, he said "They need to be taken out and burned!" Instead they

were left in the back of the unit or in the cells, dirty and piled up. The women who tested positive, their belongings were bagged up and given no PPE.

As of July 13th 2020, we were still eating "bag nastys" and moldy veges. Onions and tomatoes were swimming in slime. We were finally going to get to buy hygeines because non were given and Blake had then talked to the press. On the 15th, a "hot meal" cart went by outside to feed the workers in quarentine, not the rest of the prison. The 18th came and went and we still hadn't been able to buy hygeines. like we were promised. On the 19th, I was taken out with less than 30 inmates and tested with a rapid test and tested positive and sent back to my cell.

On the 23rd we FINALLY were given hygeines. Finally got a warm with meal of chicken patty and

-13-

I want to ask you, if your sister or mother or any other loved one was so unfortunate to be here, or even have to work here for that matter, how would you feel if you knew they were subjected to this? The staff here have to fight for "hazardess pay". If their work place is hazardess and they get higher pay due to such, and the staff sues for the BOP not giving them masks, PPE gear, why would anyone believe they gave us inmates any? They didn't!

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the following is true and correct.

March 22, 2021

Shawna Nicole Enloe
# 03306-479

④

Facts; Cause of Actions

L. Ed. Digest: civil Rights 322

42 U.S.C.S. § 1983, which provides in part: "Every person who, under color of any statue, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..." (Thomas, J., joined by Roberts, Ch. J., and Scalia, Kennedy, and Alito, JJ.)

Deprivation of Rights - liability

Because we are in prison does not justify abuse, mental abuse, deliberate indifferences, by failure to train, deliberate indifferences by medical care, testing, and all concern toward inmates 8th amendment Rights. These protections are CLEARLY here in place, not only due to protect the human inmate, but are there because these types of cruelty and unusual punishments have INFACT accorded and can not be brushed under the rug because the BOP and its staff members feel they are untouchable. Power is allowing abuse.

Local government: employees' actions -
vicarious liability.

L. Ed Digest: Civil Rights 327

A municipality or other local government may be liable under 42 U.S.C.S. § 1983 if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation. But, under § 1983, local governments are responsible only for their own illegal actions.

They are not vicariously liable under § 1983 for their employees' actions.
(Thomas, J., joined by Rehnquist, Ch. J., and Scalia, Kennedy, and Alito, JJ.)

Question here is "What if the municipality or/and local government had knowledge of the abuses and illegal acts?
In the case of FMC-Carswell they were notified by media, families, and suffering women....
When is power, title, money going to stop being the shield?
This Plaintiff seeks a answer to this question, not only for herself but for each female, male prisoner whose life has ended or attempted end or abuse by these municipalities and local governments.
Plaintiff ask this court "Will you protect my rights? Plaintiff hopes to include the Bureau of Prisons (BOP) as a Defendant to her 42 U.S.C.S. § 1983 action.


Municipal liability - official policy - failure to train

L. Ed. Digest; Civil Rights § 27

Plaintiffs' who seeks to impose liability on local governments under 42 U.S.C.S. § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymakers, agents, and practices so persistent and widespread as to practically have the force of law. These are actions for which the municipality is actually responsible. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens rights may rise to the level of an official government policy for purposes of § 1983.

Exhbit "A"

Mask we are given. Never
any N95 or Medical grade. Those
Were ordered but Warden Carr
had inmate Bishop pack them all
up and had them shipped out.
He had these made for us.

You can see the low grade it is

"That's because he and The BOP are indiffe-
rent to our lives."

 **INVESTIGATES**

# Inside the federal prison where three out of every four inmates have tested positive for coronavirus

By Casey Tolan, Nelli Black and Drew Griffin, CNN
Updated 8:07 AM ET, Sat August 8, 2020

(CNN)When James Giannetta first called his brother Russ in late June to tell him that the coronavirus was beginning to spread in his Texas federal prison, Russ could hear the fear in his voice. "This place is exploding," James warned.

Russ soon got another call: James, a 65-year-old inmate with diabetes and HIV, had tested positive for the virus himself. Within days, he was rushed to a hospital as his oxygen levels plummeted. A few weeks later, after his condition deteriorated and he was placed on a ventilator, he was dead.

As coronavirus has spread rapidly through prisons and jails around the country in recent months, the Texas lockup where Giannetta spent his last days has emerged as the hardest-hit federal prison in the United States. More than 1,300 of the roughly 1,750 prisoners at FCI Seagoville prison and camp have tested positive for the virus, according to data from the federal Bureau of Prisons -- a stunning three out of every four inmates. So far, three inmates at the prison, including Giannetta, have died from Covid-19.

Five Seagoville inmates told CNN in phone interviews from behind bars that they feared for their lives as the virus rushed through the Dallas-area prison, and that the crowded conditions made it all but impossible for them to stay socially distanced.

"It came through here so fast that it's out of control," said Bobby Williams, an immunocompromised inmate who has about three years left on a more than two-decade drug sentence. He said he came down with severe pneumonia after contracting Covid-19 in June. "We're packed like sardines."

As the BOP has scrambled to stanch the spread of the virus in its facilities, the toll at Seagoville and elsewhere raises questions about whether the Trump administration is doing enough to release elderly and medically vulnerable prisoners -- even as several high-profile inmates like former Trump campaign manager Paul Manafort, former Trump lawyer Michael Cohen and the rapper Tekashi 6ix9ine have been released from prison to home confinement.

The BOP declined repeated requests for an interview with officials at Seagoville or national officials involved in setting coronavirus policy. A spokesperson said the agency distributed cloth masks to every inmate and guard, began mass testing of inmates in the prison by late June and stepped up sanitation procedures, among other policy changes.

But the low-security men's prison -- which once held Japanese and German detainees during World War II, among others -- is now a cautionary tale for how quickly the coronavirus can take deadly hold in correctional facilities.

Since the beginning of May, when there was only a single coronavirus case at Seagoville, the number of inmates who have tested positive has soared to 1,333, according to BOP data (including prisoners at a minimum-security camp next to the prison). Twenty-eight of the roughly 300 prison employees have also tested positive.

The outbreak means that the facility has more coronavirus cases than about 85% of the counties in the US.

Dr. Homer Venters, the former chief medical officer for New York City's jail system, who has inspected federal prisons' coronavirus response plans, said outbreaks at Seagoville and other prisons were like "popcorn kernels popping off over an extended period of time."

"There are many facilities that either have gone through the same thing or will," he predicted. "This is really a tragic situation that's playing out all over the country."

## Early release programs fall short

Prisoner rights advocates say that the BOP has fallen short on the most effective way to save inmate lives: reducing the number of vulnerable people inside the prisons.

Federal inmates have two paths to early release during the pandemic. The BOP is evaluating inmates for home confinement, which is granted based on factors like inmates' age, risk factors for Covid-19, the seriousness of their offense and their conduct in prison. Manafort and several other high-profile inmates were released under this method, which was expanded under the CARES Act earlier this year.

The agency has released 7,444 inmates to home confinement nationwide over the last four-and-a-half months, according to data released by the agency, out of the more than 157,000 total in the federal system. A spokesperson declined to provide specific numbers for Seagoville or other individual prisons, citing "the fluid nature of the pandemic situation."

Inmates can also apply for compassionate release, a procedure that was streamlined with the passage of the First Step criminal justice reform act in 2018. Inmates with health issues can ask a judge to reduce their sentence; they can also apply to their warden for the federal government to file a court motion for release on their behalf. So far, roughly 900 additional inmates have been released through that track this year, according to Families Against Mandatory Minimums, a criminal justice reform group that has helped recruit attorneys to represent inmates in coronavirus cases.

But criminal justice experts call the releases so far a drop in the bucket compared with the vast numbers of elderly and medically vulnerable people in federal custody. Kevin Ring, the president of FAMM, said federal officials had been arguing in court against many inmates who have petitioned for compassionate release.

"It's been disappointing because most of these people were elderly and sick and now they're the most at risk from this disease," Ring said, arguing that the Trump administration "should have been clearing these people out."

Instead, he said, officials were "slow to react" when the coronavirus started its deadly march through prisons around the country. "We've watched it hop from facility to facility -- when it hits one, it ravages it," Ring said. "It has been terrifying to watch."

Nationally, more than 10,000 federal inmates and 1,300 BOP employees have tested positive for coronavirus, while 111 inmates and one staffer have died.

Several other federal prisons have also faced dramatic outbreaks, although none that infected as many inmates as Seagoville's. In Ohio, a judge ordered officials to release or transfer more than 800 vulnerable inmates at another federal prison ravaged by the virus, saying the conditions in the facility had possibly reached the level of "cruel and unusual punishment." But an appeals court struck down that order in June, finding that the inmates did not prove the BOP was "deliberately indifferent" to the risks presented by Covid-19.

Some Democrats in Congress have pointed to Manafort's release to argue that the administration isn't treating inmates equally. If the coronavirus was "deadly enough of a virus that you needed to protect the former campaign manager, why not all of these Americans who also are vulnerable and have at-risk conditions?" Rep. Sylvia Garcia, D-Texas, asked Attorney General William Barr at a House hearing last week. Barr said he had nothing to do with the decision to send Manafort home but noted that the department had released thousands of inmates.

All five of the Seagoville inmates interviewed said they had been denied compassionate release or home confinement, and some said their families were planning to go to court. In a message denying his request for compassionate release, the prison's warden wrote that "at this time COVID-19 is not considered extraordinary compelling circumstances" under the BOP's compassionate release policy, inmate George Reagan told CNN.

The BOP spokesperson said the agency didn't comment on specific inmates' requests for early release.

For some inmates, the potential of early release came too late. Giannetta, a Massachusetts native who was serving a 14-year sentence for selling methamphetamine and other charges, applied for an early release from the warden and was denied, according to a filing by his court-appointed lawyer. The lawyer submitted an expedited motion for compassionate release on July 3, after he had already tested positive and been sent to a hospital. A judge dismissed the petition as moot after Giannetta died at the hospital on July 16.

Giannetta's older brother Russ, a physics professor at the University of Illinois, said in an interview that he had sent medical documents outlining his brother's myriad health issues to officials at the prison and even wrote a letter to the Centers for Disease Control and Prevention, but his pleas for help didn't seem to have any effect.

The Seagoville facility was a "petri dish," Russ said. He said James knew even before he tested positive that he was in real danger: "He had a pretty good premonition that this was not a place that was going to be able to contain this virus if it broke out."

Prison struggles to respond to outbreak

In interviews, inmates at Seagoville described a chaotic response to the outbreak by prison officials, whose efforts to slow the spread of the virus were hampered by delayed test results and a lack of enforcement of mask-wearing policies.

Bobby Williams, who has skin cancer and takes medicine that reduces his immune response, said he came down with pneumonia after testing positive for the virus. "I thought I was going to die," he said. "I was passing out, I couldn't breathe."

He said doctors at the prison gave him steroid shots and a nasal spray that helped, but over a month later, he still feels the impact from the virus. Williams, 56, has been in federal prison for 22 years and has about three-and-a-half years left to go on drug and money laundering convictions.

Venters, the former New York jail medical officer, has conducted dozens of inspections of coronavirus response efforts in prisons and jails around the country, including BOP facilities. He said that while he hadn't inspected Seagoville, the numbers and stories shared by inmates were troubling.

"What I've found over and over is there is no special protections or special surveillance for high-risk patients," Venters said. In many BOP facilities, he said, "I have observed very large numbers of people in very close quarters, which makes the spread of this virus inevitable once somebody becomes sick."

One difficulty has been the delay in getting test results. Curtis Severns, a Seagoville inmate scheduled to be released next year after an arson conviction based on disputed evidence, said that he and other inmates faced a four-day delay between taking a test and getting the result last month -- which meant that the prison didn't move some positive inmates out of the general population until it was too late.

The BOP spokesperson said Seagoville was using a rapid 15-minute test machine as well as commercial lab tests that have turnaround times of three to 10 days.

Severns, who tested positive and was mostly asymptomatic, said he is now living with five roommates -- all of whom have also tested positive -- in a small former TV room converted to housing.

"I was amazed just how fast (the virus) went, once it started going," he said. "I think everybody here's going to get it."

Mask wearing has been spotty among both guards and inmates, several inmates said, although they added that more people in the prison are now wearing masks regularly in the last week or two as cases have shot up.

Joseph Perrone, who said he is scheduled to go to a halfway house in a few weeks after about a decade in prison for selling cocaine, said he suffered headaches, a loss of

smell and the worst muscle aches of his life after testing positive. "It felt like somebody beat me," he said.

Perrone, 55, who said he worked in the prison's food service at the beginning of the outbreak, said most of the guards overseeing him weren't wearing their masks at the time and "they didn't make us wear ours."

"I was going to work and I'm sure I was infecting people," he said.

Now, as the cases have reached a level that could result in a form of herd immunity in the prison, officials are starting to move operations back to normal, according to a memo to inmates that several described to CNN. Coronavirus-positive inmates who are symptom-free for 10 days will be considered recovered in most cases, and they will start to be moved back to their original housing locations soon, the memo said.

According to BOP statistics, 1,287 inmates at the prison have recovered from Covid-19, while 46 still have active cases.

## Beyond the prison walls

Visitation has been shut down at Seagoville and other federal prisons for months -- but outbreaks behind bars can still spread to local communities as guards and other employees go back and forth to work.

Correctional officers at the facility say they're scared to walk inside the prison's walls, especially because while the agency has tested most of the inmates, it hasn't done the same for the prison's 283 employees. *are their lives more important*

Anthony Simon, a case worker at the prison and a representative for the local union, said he had appealed to the management for broader testing. When he comes home from working at the prison or attending to inmates at a local hospital, Simon said, he strips off his clothes, puts them in a bag and showers before even greeting his wife.

"Everyone's worried they could bring it home to their family," Simon said. "But you're still required to go to work -- we can't leave the inmates by themselves and say we'll come back later."

The BOP spokesperson said the agency couldn't require employees to get tested, but it's providing staff who come in close contact with Covid-19-positive inmates a letter to public health departments that can help them get prioritized for testing.

Research has suggested that prison coronavirus cases can seed broader outbreaks in their local communities. A study of Chicago's Cook County Jail found that inmates going in and out of the jail may be linked with more than 15% of all the virus cases in Illinois as of April.

Still, local officials in Dallas County said they didn't think that Seagoville was having a major impact outside the prison itself. The prison outbreak "has not strained our local health resources as the facility has handled their own response and contact tracing," said Lauren Trimble, the chief of staff for the Dallas County Judge, the county's top executive.

Family members of inmates have organized several protests in front of the prison in recent months. One of the protest organizers, Tabitha Wheeler-Reagan, a Dallas entrepreneur and activist whose husband is a Seagoville inmate, said she thought people in the community weren't paying enough attention to the human suffering in the prison.

Her husband George Reagan, 55, who is scheduled to be released from a more than 5-year drug sentence next year, was sharing a cell with another inmate who got coronavirus in late June, she said. Reagan tested negative twice, so the prison didn't isolate him from the other inmates, Wheeler-Reagan said.

Then, early last month, Reagan called his wife with ominous news: he had lost his sense of taste. She said she immediately called the prison and demanded he get tested again. Once he did, he tested positive.

Wheeler-Reagan said she thinks the prison leadership didn't take the outbreak seriously enough early on and the guards didn't have proper training about how to respond. She was confused why prison officials rejected her husband's bid for home confinement during the pandemic, especially considering he has heart disease and he'll likely be eligible to go to a halfway house later this year, she said.

"I one hundred percent don't think that the federal government cares at all," Wheeler-Reagan said. "This is one of those situations where they can't blame anybody but themselves."

*CNN's Collette Richards contributed to this report.*

Maybe if the world stop only seeing a inmate as a "inmate", we are still real Humans with real hearts, feelings, minds, familes dreams and worries.

Calling us "Inmates" removes from the worlds thoughts that we are real people not only the title given by where we live! It's so easy to be cruel to us and disreguard it as ... "Their inmates, They deseve what they get. Total removal of humanity promits our Abuse.

Exhibit "B"

News article on FMC

Carswell

# U.S. House probes outbreak at detention facility

*Exhibit*

## CDC to aid with testing at migrant center with many cases and 1 death

BY ANTONIO OLIVO

The House Committee on Homeland Security on Friday asked for records related to a widespread outbreak of the novel coronavirus inside a Virginia immigration detention center after a 72-year-old detainee there died while hospitalized with the disease earlier this week.

Also on Friday, Virginia Gov. Ralph Northam's office said the nation's top public health agency has agreed to conduct widespread coronavirus testing at the facility located in Farmville.

The facility has experienced the nation's largest coronavirus outbreak inside a detention center, with 259 detainees — most of the population — being monitored for the disease, according to Immigration and Customs Enforcement.

In a letter to Immigration Centers of America, the company that operates the Farmville facility, Rep. Bennie Thompson (D-

Miss.) said his committee is concerned about how the outbreak has been handled since the first coronavirus infection was recorded there in late April.

"Farmville detainees report that they have been pepper sprayed and fired at with a 'noise-distracting round' in response to their protests on the spread of the coronavirus inside the facility," Thompson wrote. "This is dangerous, as the use of irritants such as pepper spray can induce coughing, increasing a person's chance of catching a respiratory illness such as COVID."

Those allegations also were included in a lawsuit filed in federal court last month. That suit was filed a few days before Northam (D) and both of Virginia's U.S. senators asked President Trump to allow the U.S. Centers for Disease Control and Prevention to get involved.

Thompson's letter requested, among other things, details about the transfer of 74 detainees into the facility in June, people the lawsuit claims were not tested for the coronavirus beforehand.

Immigration Centers of America referred questions from The Washington Post to ICE, which

declined to comment on Thompson's letter.

But ICE officials confirmed that James Thomas Hill, a Canadian national held at Farmville since the spring, died Wednesday night, nearly a month after he was hospitalized with covid-19, the disease caused by the coronavirus, in Lynchburg.

ICE officials said the cause of Hill's death is still under investigation, though he had been experiencing shortness of breath when he was hospitalized. The agency said no other Farmville detainees are currently hospitalized.

"ICE is firmly committed to the health and welfare of all those in its custody and is undertaking a comprehensive, agency-wide review of this incident, as it does in all such cases," the agency said in a statement.

The death sparked a fresh wave of outrage among immigrant advocates over how the pandemic has been handled inside the Farmville facility and other immigrant detention centers.

In particular, ICE's willingness to transfer detainees between facilities during the pandemic has allowed the disease to spread, those advocates said.

"That is directly what led to this man's death," said Simon Sandoval-Moshenberg, legal director of the Immigrant Advocacy Program at the Legal Aid Justice Center, which is representing some of the plaintiffs in the federal lawsuit filed in Alexandria's U.S. District Court.

Northam spokeswoman Alena Yarmosky said that the CDC agreed last week to conduct widespread testing at the facility after the governor appealed to Trump for assistance. CDC officials didn't immediately respond to messages on Friday.

"While the state is unable to enter this property without permission from the facility, the Governor has pushed for months to gain access for increased testing and disease management," Yarmosky said. "In fact, the Department of Health has repeatedly attempted to assist with testing but has been denied by this center."

ICE has said it has taken "extensive precautions" to limit the spread of coronavirus among its detainees, including regular testing and adding more handwashing stations inside its facilities.

*antonio.olivo@washpost.com*

Exhibit "C"

The BOP Policy on cell space. We are (4) to a cell that is only 88ft. We should Just Barely meet a Two person cell. There's more Deliburate indifference, crukety....

They wrote their polices yet know ever in a pandemic and 6ft. aparts A CDC guideline, We are packed.

Certificate of Service

I, the undersigned, do hereby certify that I have served a copy of this motion upon the clerk of this court, via U.S. mail, properly addressed, First-Class postage prepaid, placing into the internal mailing system as made available to inmates for legal mail at the FMC Carswell Federal Correctional Institution.

The movant/Defendant further requests that a copy of this [HER] pleading be forwarded to all interested parties via the CM/ECF system, as she is detained, indigent, and has no other means.

Done this 19 Day of March, 2021

x _Enloe_

Shawna Nicole Enloe
#03306-479



Shawna Enloe #03306-479
FMC Carswell
P.O. Box 27137
Ft. Worth. TX 76127

FORT WORTH DIVISION
RECEIVED
2021 MAR 29 PM 1:56
DEPUTY CLERK

LEGAL MAIL

U.S. District Court
Office of The Clerk
501 W. Tenth St. Rm. 310
Ft. Worth TX 76102

CERTIFIED MAIL
PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

FMC Carswell
P.O. Box 27066
Fort Worth, TX 76127
Mailed: 3-9-21

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. (4)

LEGAL MAIL